Case 25-1813, Western District of Missouri, United States v. Robert Manley, Jr. I believe I can still say Good morning, and I apologize. I've got a bad cold, so I'm going to have this right here in case I need it. My name is Jane Pansing Brown, and I am the attorney for the appellant Robert Manley, Jr. I also represented him in the Western District of Missouri. There are two points in this case that we alleged caused a miscarriage of judgment. It's a little different than some of the other cases I've been hearing today, and that's different for you all, too. If I could briefly tell you what my background is, I was in private practice, a partner in a law firm. Then I was a state court trial judge for 12 years in Clay County. After that, I went to the U.S. Attorney's Office for 17 years, so I was a federal prosecutor. I worked with Mr. Davids, who I have great respect for, and also Patrick Edwards, one of the attorneys who I have great respect for. So the only reason I bring any of that up is I know a miscarriage of justice when I see it, and that's what's happened here. The first point has to do with emails that were sent by Mr. Edwards. He is now Jackson County judge. When we were negotiating the plea and in those emails, he said that the government agreed that there would not be, that there would be a guideline sentence. So when my client signed the plea agreement, and I freely acknowledge it says in there that either side could ask for a variance. We talked about it, I had talked about it with Patrick Edwards, and then he became a judge. So another attorney was assigned. And I referred to that person as the second prosecutor, and I will continue to refer to him as the second prosecutor. Why doesn't that written plea agreement override any previous conversations regardless of whether it's the first or the second prosecutor? And it's possible that it does. I think that's your decision. But I think the reason it was discussed is because it shows a pattern in this case of what ultimately happened. And I'm, I'd like to spend more time on the second point if I could. The second point has to do with PSR objections, and the second prosecutor violated Eighth Circuit law when he failed to put on evidence related to PSR objections. In the Campos case and the Wise case, both of those which he was aware of, because it was in my objections themselves, there were 40 PSR objections that we lodged. Prior to the actual sentencing, because we knew that the trial judge would not want to hear us talk about 40 PSR objections, the second prosecutor and I sat down and we came to agreements about how we would go forward. And the agreements were that my client, Mr. Manley, would agree to 30 as the amount of guideline level, and that he would agree to a gun enhancement. Well, why in the world would we do that unless there was something that the prosecutor agreed to? Well, the prosecutor agreed to numerous things, and he agreed to not talk about the things that, three different things, if I might refer to my notes. Specifically, he agreed. As an initial matter, if I'm, just so I understand, the prosecutor agreed not to seek certain enhancements. That is correct. Were there two or three? There were three. Three additional enhancements. Three additional enhancements. He did agree, for example, something he agreed to was, even though my client pled guilty, the PSR said that he shouldn't get acceptance of responsibility. The prosecutor said, no, we agree that he should because he pled guilty. He had had one bond violation, and that's why the PSR said that. There were some other matters that he also agreed that, in a positive way, that we would, he would not seek that enhancement. But three items that he said he would not seek an enhancement on included cash apps that my client, the PSR, had assessed enhancements for cash apps. When you say he agreed he wouldn't seek an enhancement on, I thought he said he wouldn't introduce evidence. Was that, or am I, did I misread the record? I was there, so let me reflect on this. I have two different memories of this. One is my memory of sitting down at the U.S. Attorney's Office with him in a conference room and coming to agreements. And so that agreement, at the time, he knew that if he brought up these things, like the cash apps and the money laundering and the 2013 conviction, he was going to have to present evidence. So that is my memory of what, what the agreement was. As far as what happened in the courtroom, suffice it to say that, that several things that the second prosecutor said were not what we discussed. So I understand the government's argument. They're saying, well, we agreed not to put on any evidence to support certain enhancements, and in return you'd withdraw objections. But then they say, well, but it's okay if we put on the same evidence under Section 3553A. Yes, Judge. They're saying that, well, the second prosecutor made arguments about three things. The 2013 incident where there was no conviction, and why did he do that? Well, it would have been pretty hard to bring evidence in from 2013 in 2025. It was easier for him. Did you object? I did object. I objected when he did all three of those things. But to those paragraphs in the pre-sentence report? I objected to those paragraphs in the pre-sentence report. I gave up my objections in the discussion with that second prosecutor because he agreed that he would not go forward with that. And that's a miscarriage of justice. You can't just say something when you're arguing like he did. You can't just say, you know, bring up things that you've told someone you won't bring up. He couldn't prove the cash apps either, and he couldn't the money laundering. He said he would not discuss. It may seem like deception or dirty pool, but if it's not in the written agreement, can this court find error? Well, I like your description because that's how I felt. But you can't, you can't waive PSR objections in a plea agreement. You haven't even seen what the PSR has said yet when you actually go forward with the plea agreement. And so, and that is in my brief also. So the PSR came out after the plea agreement was signed. I think what I called it was, I mean, we know the phrase the cart before the horse. I think I said it was the horse before the cart. But you had the discussion about the negotiate, the negotiations for what you would withdraw and what they would proceed with after the pre-sentence report was prepared. That is true. Yes. But that's not what happened. And if I might, I see I have a minute 22 left before I can come back up. Actually, that is your rebuttal time. Oh, I'm sorry. You're free to take it. Appreciate it. I made it. May it please the court. My name is Justin Davids. I'm an assistant U.S. Attorney, and I represent the Appellee, the United States of America. To briefly address the first point. The record is clear. There was no agreement by the government to bind itself to a guidelines recommendation. The plea agreement itself is very clear that the parties may advocate for a sentence above and below the guidelines. The plea colloquy, the judge made sure that the parties understood that was in the plea agreement. The defendant stated that there were no other promises outside of the plea agreement. And Ms. Brown is right. We've known each other for a long time, and I know that she is a very good attorney. I don't believe she would have walked her client into a courtroom and had him tell the judge that there are no agreements outside of the written plea agreement if that weren't true. Importantly, even in her sentencing memorandum, after the PSR has come out, Manly admits that the parties are free under the plea agreement to ask for an above or below guideline sentence. So that's what's in the record. As far as the second claim, let me ask you about that. Did the government agree not to put on evidence to support certain enhancements in return for the withdrawal of objections? The government agreed to not put on evidence as to certain guideline enhancements, but I think that this needs to also be reviewed in conjunction with how the agreement is explained in the defendant's own sentencing memorandum, right? And in that memorandum, the defendant explains, we've come to an agreement on the guidelines. This is how we think it should work out. And if the court goes with us on those guidelines, the defendant says, we withdraw all of our objections except for those that relate to the three specific enhancements that the government agreed not to seek, right? So the first was information related to Rocky Orozco's Snapchat. That's what we call the marketing enhancement. That's in paragraph 69 of the PSR, all right? The facts supporting that are related to, in PSR, paragraphs 40 and 41, and that is, in the PSR, that's a transcript of intercepted communications. There were wiretaps in this case. And so that's Snapchat, not Cash App, Snapchat, right? There is issues about facts relating to Cash App in the PSR. But that enhancement goes to that, all right? The sentencing memorandum then says drug premises enhancement. That's PSR, paragraph 70. And that was based on enhancement based on drug dealing out of Manley's apartment. And the PSR explains that the writer explained that it based on enhancement on facts contained in the factual stipulation in the written plea agreement. So those aren't even PSR facts that we're supporting that enhancement. It's facts admitted to by the defendant at his change of plea. And those are contained also in PSR. The explanation is at pages 35 and 36 of the PSR. And then there's the enhancement for misrepresentation. That's in paragraphs, in PSR, paragraph 71. Fentanyl pill distribution to a co-conspirator, Danzel Walker, about misrepresenting what type of drugs these are. And that incident was talked about. The facts of that were in PSR, paragraph 20. So those are the three areas that the defendant's sentencing memorandum said were to contested issues. That the government was now conceding it wouldn't seek to get enhancements for. Right? And so the defendant said that he was withdrawing all his other objections. So when the defendant says that they made objections, they did make objections. They also withdrew objections. Right? So to go back, once the court accepts that stipulated two guidelines calculation, triggering those objections being withdrawn, it doesn't seem quite right to now claim, no, I still was maintaining those objections. Right? And we still have the appeal waiver here. And we still have the appeal. So really what we're talking about here is whether any error is a miscarriage of justice. Sure. And I don't see how we get to miscarriage of justice. Right? So for two reasons. First of all, I believe it's incumbent upon any lawyer, prosecutor, defense, civil attorneys, to not argue for things not in evidence. I think we all agree that that's appropriate. But that's different than whether there was an agreement about guidelines and what evidence to present. That obligation on attorneys exists whether there was an agreement or not. Right? When an attorney doesn't follow the law on that, that doesn't mandate automatic reversal. It might trigger an objection from opposing counsel. What becomes a miscarriage of justice is if the court would then rely on unproven facts as part of its sentence, whether that's guidelines or 3553A. And Mr. Manley here has never raised that obligation, that allegation. He's never said that he believes that the court relied on those. And there's no evidence in the record that the court did. Do you don't think that the district court referenced some of the objected conduct? I don't. You know that when this was raised at the district court, the judge was like, okay, help me help me understand like what I can consider in the PSR. He's like, are you saying I can't consider these facts? And the defense's response was I don't want you to consider things regarding Mr. Roscoe, because Mr. Roscoe had died. But you can consider anything involving Mr. Manley. That's consistent with their withdrawal of most of their objections. And it's also greenlighting to the court that it can consider anything in the PSR involving Mr. Manley. And that's what the court did here. Now, there was no enhancement for money laundering. So that wasn't part of any agreement. That a money laundering conspiracy to commit money laundering was withdrawn. But that doesn't mean the government couldn't talk about it. And in fact, the defendant admitted numerous items were drug proceeds, were the result of drug proceeds in his plea agreement. He didn't object to certain things in the PSR. I think it's paragraphs 53 through 55 are financial transactions that went on unobjected to. And I got to say on this 2013 incident, which is at the Embassy Suites Hotel, it's been asserted today that they were objected to in the PSR. They were not. You can go to the PSR addendum. You can see the defendant objected to, I believe, PSR paragraph 16. Which was about what a confidential informant had said around that same time period. But she did not object to paragraphs 14 and 15 in the PSR.  And so those were unobjected to. And to the extent that they objected to it, then subsequently at at sentencing, that's against the local Western District of Missouri local rules by not providing notice, the judge is under no obligation to accept those objections. Also note that as part of this these guidelines agreement, Mr. Manley agreed to the plus-two gun enhancement. Part of that enhancement was the firearm found in the 2013 incident. That was part of the basis for that plus-two enhancement. So to agree that that enhancement implies, but then to not allow the prosecutor to mention the incident that resulted in that plus-two enhancement to which they agreed, also doesn't seem appropriate. So here the government doesn't, first of all, the government doesn't believe there was any binding agreement regarding the guidelines that then translated into what could be argued under 3553. And the government also asserts that the government did not reference objected to facts in support of its 3553. And even if it did, there was no miscarriage of justice because there's nothing in the record supporting that the court relied on this information. Thank you. Thank you. In responding to the specific items that the government stated in the sentencing memorandum where it said we agreed to withdraw all of our objections, that was based on the conversation with the prosecutor, the second prosecutor, and my belief that he would follow through with what he said in court. So you can consider it. I wrote it, but it was based on what another attorney told me who I trusted. Now there's an exception to the appeal waiver for prosecutorial misconduct. You're not alleging that though, are you? Judge, I looked at that because I felt, I'll quote one of you all, that what happened was dirty pool. But when I looked at the cases, the cases that you all had decided and other circuits had decided, it appeared to me that it did not rise to the level of what those cases said. And so all I can do is stand here today and I think you understand how I feel, but I did not allege that. Might I have 30 seconds to conclude? On the 2013 incident, we did discuss it as something that would not come up and paragraph 16 involved a confidential informant related to 2013. I have not looked to see if Mr. Davids is right about the other two paragraphs. I trust him if he says it. I do believe it to be true, but the whole matter was discussed. My client had no felonies when he was sentenced here, none. And most certainly he was deserving of going to jail under federal law. He knows it and I know it. But what I do know is that there were several incidents in this case that don't pass the smell test. Regarding miscarriage of justice, if I could quote a Supreme Court justice from 1964, I think I was six years old, when you talk about miscarriage of justice, I know it when I see it and I saw it here. That's all I have. May I state one other thing for the record? This is my last oral argument ever. I first argued in front of this court in 1983 and here it is 2026 and it's always been a pleasure on to have a record. I want to thank two people in my life who caused me to be an attorney. It would be my father, David Pansing, a Missourian, and my uncle, Tom Pansing, Sr., a Nebraskan. They had seven kids between us themselves and five of them became lawyers. And so thank you for the opportunity to argue in front of you all and it's been an honor. Thank you. Thank you for that statement. Congratulations. And we appreciate the fact that you've dedicated a portion of your professional career to the CJA panel and representing folks who need counsel like you. Thank you. Thank you both. Does that conclude our